21-1079 Eden v. Justice 21-1102 AJE Enterprise v. Justice The government exists to advance the public good. Sometimes public good requires difficult choices to be made. The best example is when there's a forest fire. Sometimes we set fire ahead of it to deprive the fire of fuel. And sometimes we'll burn down someone's house. That's fine. But the function of government then is to distribute that loss of that individual who suffered across a larger spectrum. So here, that has not occurred. What happened here with pandemic issues is that Governor Justice imposed a variety of executive orders that have specifically impacted the bar owners in Montgomery County and the city of Morgantown. In West Virginia, like other places, we have planned for emergencies. We have an emergency statute. But the governor made an effort to impose himself on a public health system. We, in fact, also have legislation that deals with public health fully and completely. And I understand that practically every state has a state of emergency statute. My question is, is the state of emergency still in effect? My understanding is it is, Your Honor. And so this, I have looked at some mootness cases. In fact, one from this court and other places, those have disappeared. And so that rule changes. Counsel, I'm sorry. What is your argument for why this case is not moot? Well, I've asked for a couple of things, Judge. Most importantly, the Supreme Court has said that as long as we're under an existing threat, I think that the mootness is not an issue. And because there are still a state of emergency, then that's a problem for us. Number two, one of the things that we asked for in our complaint is we asked for this, for the court to require the state to initiate condemnation proceedings. So basically, we've described that as a reverse condemnation issue. And because that would deal with constitutional issues, we think that that's appropriate to be handled by the court. Now, it is true that the district court could not award me damages under 11th Amendment principles. And so we didn't ask for that. So what we asked for is this reverse condemnation process to go forward. And that's referred to, I think, on pages 31 and 32 of the appendix. I know you had a takings claim and a reverse condemnation claim. Are those one and the same, or are they separate claims with separate theories? I was a little unclear. Judge, it's a little difficult. We've just, in 2017, Western India described reverse condemnation as applying to personal property. I think that it invigorates the takings claim. If the district court can't get to it, then it'll set up another process. If the district court can't get to it because of 11th Amendment issues, then this sets up a process for the court to have a way of addressing the harm but not awarding the damages, and then would allow me to proceed further with the damage issue, assuming that I can make the takings case. Could that claim be brought against the city or only against the state? Well, I think I can do it either way. I think I can do both. Traditionally, it's only the state that enjoys 11th Amendment immunity. You could get damages from the city, but I didn't know if they actually are on the hook for takings or if it's only the state. I really just don't know. I think it's to be determined, Judge. The takings issue is a difficult one for me. I have relied primarily on the Sawyer case when the president took the steel mills, and the difficulties there is that court said that there were takings problems, and I acknowledge that there remain some issues under the takings jurisprudence, but those seem to be evaporating. I won't say evaporating. That's too far a word, but they are lessening over time. The issue at one time had been that you could only have a takings case if the government took 100% of what you owned, and we have seen the government take less than 100% and still have takings awarded. There's a case in the Supreme Court about air rights in New York that I would indicate. I think that's a curable problem. Yes, Your Honor. Sorry. I just wanted to clarify. In looking at your briefs in the district court on the preliminary injunction, because I know there wasn't an opposition to the motion to dismiss, but you addressed the takings claim, but I didn't see reverse condemnation mentioned in any of the district court filings, and so I was a little confused about whether that had been forfeited or whether that is somehow incorporated in the takings label. Judge, I was trying to pursue a preliminary injunction at that point in time, and I don't think that I've given up other items that I outlined in the complaint when I did that as well. But you didn't oppose the motion to dismiss on any grounds? I did not file a brief. I did mechanically, Judge, to explain what happened. My brief was due here on the preliminary injunction issue, and I intended to rewrite it and file it with Judge Bailey. I missed the deadline, and he ruled very promptly. He's a good district court judge, and he did exactly what he should do, and so consequently I was late. So I felt that I'd made the arguments, and that's why I don't think that I lose on a procedural nicety for having failed to file that brief. Can I ask you about a different procedural nicety? I don't see a takings argument. Your brief on appeal seems only to raise the issue of separation of powers and how the governor violated West Virginia's separation of powers, and then sort of acknowledging that that's not usually something a federal court can address, and then that in turn violated the federal due process clause. But I don't see any other argument in your brief on appeal. And I'll agree with you, Judge, but if there is a due process problem, then I'm entitled to the remedies that go with it, and I think the takings part of that is part of that due process issue. Okay, but we agree that the only argument in your brief on appeal is the separation of powers due process argument. Yes, Your Honor. Okay. As I said, I think our public health statutes were full and robust. When I asked the director of public health in Morgantown, both an experienced physician and a graduate of law school, in fact, a member of the bar, he indicated that nothing that the governor had ordered as part of these executive orders gave him authority that he needed and did not have. And so that turns out to me to be a very telling problem here. The governor really has no role in public health. The public health director was going to deal with it in a traditional way, which is to isolate people who are ill, isolate people who have been exposed to people who have been ill, and ultimately, much like a forest fire, to let it burn out even if we don't have a cure. Now, we've not necessarily gotten a cure, but we've gotten a lot more weapons since this case was filed. But that's where we are. So I feel that the governor has gone a little – if I'm over time, I'll stop. You can finish your sentence. But I really feel the governor went too far and that that's what the due process issue is here. Thank you, Your Honor. Mr. Harris, before you get started, there is this little pesky issue called jurisdiction. I see that it doesn't look like that your guarantee clause or void for vagueness or reverse condemnation appears in your repellent briefing. Are you abandoning those claims? We are, Judge Floyd. May it please the Court, I'm Paul Harris representing the appellants in 21-1079. We fully recognize and accept the concept that federal courts must afford substantial deference to state and local officials during time of crisis or emergency. But the idea of crisis or emergency gives rise to something that is finite. That's brief in its duration. And as Judge Floyd asked the question, we have been in a state of emergency in West Virginia for almost two years with no end in sight. There has been no media or reference by the governor saying we're going to end emergency powers like, for example, the Commonwealth of Virginia has. There has been none of that. It has been almost a year since any of the executive orders that are on issue in this appeal. Almost a year ago, they were all terminated and no new restrictions have been put in place. Respectfully, Judge Rushing, they haven't been terminated. There were new executive orders placed in effect. You're correct, Your Honor, about a year ago. Those remain in effect. Just to make sure we're all talking about the same thing, I'm talking about Executive Order 1221, which expressly terminates all of the others that are on appeal here. As I understand it, Judge Rushing, not to argue with you, but the executive order that still puts in place the 100-person limit for outside gatherings is still in place. That's 821, and I think 821 is included in those that are terminated by 1221, right? I may be wrong. That's why I'm asking. We've got to talk about the details here because the details matter. We do, Judge Rushing, and it was my understanding that in the governor's brief, he makes the argument that these issues have now been resolved. For example, issues of visiting restaurants and bars are now back to normal 100% capacity. But if you look at the language of those executive orders, that isn't correct. The way it's structured is, first of all, we are still in a state of emergency, which gives the governor the power to do what he has been doing for the past two years. We just held in Lighthouse that the fact that the government has authority to do something again isn't enough to show that it is likely to recur. So we're going to need more than the authority to act. That's right, Judge Harris, but in the Lighthouse case, the governor of the Commonwealth of Virginia had essentially given up his emergency powers. All I'm saying is that we also held in that case that the authority to act does not by itself show the sort of reasonable likelihood of recurrence we're looking for. But that's when we're talking about voluntary cessation. It seems like you're saying this case isn't moot at all because these orders actually haven't been rescinded. The thrust, Judge Harris, of my argument is we have great concern on the First Amendment issue regarding public gatherings. I know in our brief we talked about other issues, but for purposes here today, we have great concern over that. What happened was there were a series of executive orders that started out with a 10-person limit, then a five-person limit per color coding of counties, then going from a 75-person limit to a 100-person limit. And right now, as it stands, as I understand it, and counsel for the governor can correct me, I may be mistaken, as I understand it, the 100-person limit for public gatherings imposed by the governor's executive order is still in place. Let me just ask you a question about your First Amendment, the right to assemble claim. I didn't see any allegations in the complaint that any of the plaintiffs want to assemble in a group of more than 100, and I don't see why there would be third parties standing in this case to raise somebody else's right to assemble in a group of 100. Judge Harris, you're absolutely correct. In count six of the First Amendment complaint, we pled these First Amendment challenges to bring the issue to the district court. This issue of standing with a proper pleading was never raised by the governor, nor— It's not jurisdictional. But I would say this court has the ability to take a look at the executive orders under the circumstances and determine whether or not they're facially invalid, and we take the position they are. And the governor, I think in his brief, talks in terms of this concept of intermediate scrutiny, and he cites the speech case Ross v. Early that came down from the Fourth Circuit. If that's the case, if the governor concedes that the executive order related to these public gathering limitations is subject to intermediate scrutiny, then when you look at that, it seems to me the district court should have given us the opportunity to have witnesses cross-examined. Every executive order from the governor says we're relying on public health officials. Nowhere in the order does it specify what the public officials say. And so we take the position that we should have had the opportunity to cross-examine the health officials that the governor is relying upon to say it's more harmful to have 100 people at a public gathering as opposed to 75 people or 500 people. Our point is those numbers to us appear to be arbitrary. And so if it's going to be subject to this concept of intermediate scrutiny with regard to these public gatherings, then we think the case should be reversed. We should have discovery and an evidentiary hearing with regard to the expert opinions and why the public health officials per the governor say it's not safe to have 50 people or it's safe to have 75 or it's safe to have 100. It just seems to us those numbers are arbitrary. And so we ask the court to reverse the district court and send the case back for further discovery. Thank you. Good afternoon, Your Honors. Judge Harris, it's great to see you all. I'm Ben Hogan. I'm from the law firm of Bailey and Glasser, and I represent the governor and Commissioner Wooten in these consolidated appeals. The last time I had the pleasure of appearing before the court, I was in my dining room. And it's great to see you. It's great to be here back for in-person arguments. And I think it's fair to say that we're in a vastly different place than we were two years ago. And, of course, like nearly every state in the country, Governor Justice imposed a state of emergency in March 2020. And the orders were focused on protecting the public health, and we knew very little about this disease. We're no longer sewing masks for our neighbors to preserve PPE for our frontline workers. We're no longer limiting who can go to restaurants and bars in West Virginia. On that point, just to kind of cut to my question for your friend on the other side, this 100-person limit, they say they point to Executive Order 8-21 and 9-20. I'm reading Executive Order 12-21, and both of those are expressly listed here as executive orders that are terminated. Is that, number one, am I reading that correctly? And number two, does the result of that mean the 100-person limit is no longer in place in West Virginia? Yes, Your Honor, you're reading that correctly. Has there been another limit put in place on the number of people who can gather? No, Your Honor, there is not. The only executive orders that remain actually suspend a number of regulatory requirements for businesses like bars and restaurants, and they, in fact, allow businesses like bars and restaurants to continue to do what they did early in the pandemic, and that is, for example, sell wine and beer to-go, which was previously prohibited. It relaxes licensure fees and requirements for those entities. And so, as a result, although there is still a state of an emergency in West Virginia, it's a distinction without a difference with respect to the Lighthouse case, which is on all fours here. And quite frankly, we have had the tincture of time to answer the voluntary cessation question. We have the executive orders expired in April 19, 2021. Since then, the mask mandate was also lifted in West Virginia. Since then, we have had the two most infectious waves of disease with respect to the coronavirus, the Delta variant and the Omicron variant. And as a result of neither of those variants, were there any whatsoever, any restrictions reimposed in response to those? And that's something that the courts grappled with in the cases we submitted in our 28-J letter. Direct evidence or indirect evidence that there's not the likelihood of repetition? The direct evidence, Your Honor, is, I believe, information that the court can take by judicial notice. And that is the scope of the Omicron and Delta waves. The fact that the executive orders, which the court can take judicial notice of, have not been reimposed and that there's been no whiff of opportunism, as Judge Wilkinson said in the American Federation case, that these executive orders were ended as a result of this litigation. They have no bearing or relation to the litigation. Why is there still a state of emergency? I'm just curious. Are there plans to terminate it? Is there some benchmark when it will be terminated? Judge Harris, I'm not sure exactly what the governor's plans are there. But I can say that part of the reason I believe that there is a state of emergency is because there are a host of executive orders that do suspend a number of regulatory regimes that, quite frankly, make it easier for businesses and others to operate. There are also some provisions in the still-existing executive orders that have to do with allowing public employees to use the time off that they didn't get to use during the pandemic because they were, say, front-line workers. There are still provisions in place for the hospitals and making sure that they're required to have a plan in place to provide enough PPE in the event of a surge, like we've seen in the past, where the hospitals have been overwhelmed. And, you know, as the Supreme Court said in the Hodl v. Vance case, during an emergency, summary disposition and administration is understandable, and it's not hard to grasp why. And that's exactly what occurred here in the early times, right? But here we are, and there's no life case or controversy, quite frankly. The orders have been moot, and neither of the exceptions to the mootness doctrine apply. I would like to raise one additional aspect with respect to the AJE case as to why the court need not even reach mootness. All of the claims that are raised on appeal have been waived by the plaintiffs, but the plaintiffs did not respond to the motion to dismiss or the City of Morgantown's motion for summary judgment. After the district court issued its opinion, there was no Rule 59e or Rule 60 motion for post-judgment relief. And there's a case out of the Fourth Circuit that we didn't cite in our brief, but it's the Palmer Lau case versus West Springfield. And it's a case that Judge Floyd cited with approval in the Stevenson versus City of Mount Pleasant, which is a 2014 decision. And that case explains, and the Tenth Circuit also holds the same, that although the district court has an obligation to review a complaint for viable claims, even in the absence of an opposition brief, when a party fails to respond in opposition and seek any post-judgment relief, those claims are waived on appeal. And the cite for that case is 362 F. 3rd 143. And it's an unusual factual circumstance and procedural posture, and I think that that's why the Fourth Circuit doesn't have any case that is directly on point factually, but that Palmer Lau case is precisely what happened here. Let me just ask you a question about order of operations. So mootness is sort of an Article III jurisdictional question. So normally we think, well, we have to do jurisdiction first, but I take it what you're saying is that this waiver ground is just another threshold ground, and as long as we're not ruling on the merits, we can dismiss a case on any threshold ground, even if we don't reach jurisdiction. Is that right? Correct. And, Judge Harris, here's the difference, and here's why it matters. If the court rules that the Eden case is moot, which it is, then under Munsingware, I'll leave this to the court to decide, but it will probably be vacated, the lower court decision. In instances where plaintiffs fail to respond or otherwise object to the judgment of the district court, in each of the cases that I mentioned, including the case out of the Tenth Circuit, which is Pickens v. Mike Houghton, and that's 166 F. 3rd. 1221. In both of those cases where forfeiture occurred, the court affirmed the lower court decision. And so in AJE, the court should both dismiss for waiver and affirm the lower court's decision because those arguments have been forfeited. And so that's why the distinction is not without a difference there. I can briefly, I think, summarize why, if the court does choose to get to the merits of the claims, why each of them fails. And it's for two fundamental reasons. First, in none of the causes of action, even those that were waived, but if you just look at the complaint and take it for what it is, none of the causes of action allege a recognized property right for the takings or the due process claims. They don't allege a recognized liberty interest. They don't allege anything that would get them over that first hurdle, including the elements of the claims. And, for example, the general right to do business is, and we've briefed this, but the general right to do business is not something that's recognized as a property or a liberty interest. In a takings instance, the Murr v. Wisconsin case explains that it has to be a deprivation of all economically beneficial use of the plaintiff's property. Now, that is not talking about the beneficial use of their chosen business model. It's talking about legal interest in the physical property. And as many people and many businesses did during the pandemic, they pivoted and they changed their business models. Gyms offered online fitness courses. Business restaurants and bars changed the way that they served their customers and patrons. And the U.S. Supreme Court has also made clear that a temporary cessation in the ability to do business as you've done it in the past does not amount to a regulatory taking. The equal protection claims in both complaints fail because there's not an identification of a fundamental right, again, the interest in doing the general right to do business, nor is there a suspect class identified that would give rise to anything other than a rational basis review. And just to my friend on the other side's point that we conceded that intermediate scrutiny applies to the First Amendment case, First Amendment issue, we don't concede that. We argue it in the alternative just as the district court did. The district court applied rational basis and then said even if intermediate scrutiny applied, this is content neutral, time, place, and manner restriction that would not violate the First Amendment because it is narrowly tailored and tied to a significant governmental interest, indeed a compelling interest. And the district court even applied strict scrutiny to the First Amendment claim and said that it would still fail given the significant and compelling governmental interest. And with the breach, any claims for separation of powers that AJE, for example, did raise in their brief on appeal, those are barred by Pennhurst to the extent that they're asking the federal courts to apply state law and enforce state law against state actors. So with that, your honors, I will turn it over to my friend from Morgantown. I would ask that the district court be, that the Eden case be dismissed as moot and that the AJE case be dismissed for waiver and forfeiture and that the district court be affirmed in AJE. Thank you. Thank you, your honor. May it please the court. Ryan Simonton with the law firm of Kate Gasto and Chaney. I'm representing the city of Morgantown and Morgantown city manager A. Kim Halls. These parties are named as respondents in the appeal filed by AJE Enterprises et al., the Montague County bar owners. However, those bar owners do not raise any contentions about Morgantown's actions in their appeal. Because of that, because those claims are not made in the opening brief under Rule 28 and under U.S. v. Al-Hamdi, the claims are abandoned and the district court opinion should be affirmed. Morgantown gets two sentences in the end of the summary of argument in the opening brief. And the basis of the statements is that the governor's orders were incorporated within the city of Morgantown statutes. So no independent claim exists. No claim was raised on appeal. And as to Morgantown, the district court order must stand. This is in addition, of course, to the governor's council's recitation of the waiver of the option to respond based on the failure to respond to the motion to dismiss, which provides a separate basis to affirm the district court's order as to all parties. To the extent that the court would consider the merits and consider them as to the city of Morgantown, AJE and the related parties have failed to state any basis to reverse the district court's opinion. Again, all public health regulations at issue were proper exercises of the police power. As to these bar owners, they're properly analyzed under rational basis tests, and AJE cannot negate every conceivable basis that those are rationally related to the legitimate public purpose of preventing harm during a pandemic. I would welcome any questions from the court, but if there are none, I would cede the remainder of my time. Thank you. In the ordinary procedural case where there was a motion for summary judgment filed and there was no response, I would concede that matter has been forfeited. What is different about this particular case is that there was a preliminary injunction hearing, there was substantial argument, and I believe that a number of the issues were placed before the court. So I would distinguish that on that particular basis. Whether that's adequate or not, I'll leave for the court to decide. It certainly was not done maliciously, it wasn't done frivolously. If you look at the timing of the orders, you'll see that my representation about my focus on responding to this court on a preliminary injunction matter will be verified. One of my clients purchased a business. It was a dance hall type business. It was in leased space. That business is destroyed. His obligations to pay rent, to make payments for his business, continue. His testimony is a record. And so we can talk about a temporary taking, we can talk about a pivot, we can talk about all of that kind of stuff. Reality is that that's not true. If you look at the Sawyer case, where the government took steel mills, the government, the Supreme Court says, this is a problem. This could be a problem in the takings clause, and that's why emergency action, the fastest action at the Supreme Court, I think, in the history of the union, occurred. From the date that the case is filed in the district court to the decision at the Supreme Court, it's less than 65 days. The case is reversed. This is a substantial undoing of a tremendous hardship. And while I recognize that there is some case law that says you've got to take everything or you've got to destroy a business, the business model doesn't get to go on, reality is, in business, you can't pivot quite that quickly. No one can. There's a harm imposed, and that's the difficulty. I'm going to go over my time, just a couple seconds. I am a bankruptcy trustee, and one of the orders that is amended is that we can take an oath remotely. Historically, you couldn't do that, and so that is an ongoing and beneficial regulatory amendment, and so I'll give that one up. Thank you, Judge. If I may, here is my analysis with regard to the issues of the orders in place. I do not doubt the representations of counsel for the governor, but this is, as I understand it, the record before us. On 4-13-2021, the governor filed with this court, Document 18, three additional executive orders. The first one, dated March 8, 2021, continues to contain the offending language that we say offends the First Amendment, and that's found on page 5 of 15 of that filing and 6 of 15, which talks about the numbers in social gatherings. The third order in Document 18 is Executive Order 1021. On the last page of that order, it talks about the governor terminating Section 4 of his Executive Order 9-20. That's found at Joint Appendix 038, that page. Section 4 says prohibited activities, but it has to do with places of public amusement, whether indoors or outdoors, amusement rides, carnivals, zoos, museums. It has nothing to do with gatherings of individuals outside, whether it's 5, 50, 75, or 100. That's found on Section 5, avoid social gatherings on JA-38. So, that's my understanding of the status of the record. Have you read Executive Order 1221? If it's in the papers, Your Honor, I have read them. 1221 is the one that terminates the executive orders we're talking about. It terminates 9-20 and 8-21 completely. Okay. Judge, if it's in the papers, I have read it. If it isn't in the papers, I haven't read it. I'm just asking because you mentioned 10-21 and it did leave something in place, but then 12-21 came after it. Then, if it's not here, I haven't seen it, Judge. So, if that's the case, Your Honor, then what we have left is the mootness issue. And I would say it was distinguishable because we still have a state of emergency. Thank you. Thank you very much. We are sorry that we can't come down and shake hands, as would be our custom, but we do appreciate your help today. Thank you. And we can adjourn for the day.
judges: Pamela A. Harris, Allison J. Rushing, Henry F. Floyd